# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT,

## OCTOBER TERM, 1868.

MANVILL BARBER, AND JULIA A. BARBER, HIS
WIFE *v.* FREDERICK BABEL, AND SOPHIA BABEL,
HIS WIFE.

POWER OF HUSBAND OVER HOMESTEAD.—The husband cannot, by his act alone,
affect the rights of the wife in the homestead, after the homestead right has once
attached by the act of either.

IDEM.—The husband cannot, by his act alone, extend the time for commencing an
action under the Statute of Limitations, upon a note and mortgage given in due
form, so as to prolong a lien upon the homestead.

IDEM.—The execution of a new note and mortgage, by the husband alone, in place
of a prior one given on the homestead before the declaration of homestead was
filed, does not continue the old mortgage in life, as to the homestead interest,
beyond the time when it would otherwise be barred by the Statute of Limitations.

HOMESTEAD A JOINT ESTATE.—By the provisions of the Homestead Act, there is
a joint estate in the homestead vested in the husband and wife, which can only
be divested by the concurrent act of both, in the manner provided by law.

FRAUD OF HUSBAND.—The rights of the wife in the homestead cannot be preju-
diced by the fraudulent acts of the husband, in which she did not participate.

HOMESTEAD A JOINT TENANCY.—In the homestead estate most of the unities of a
joint tenancy are to be found. The main difference between a homestead ten-
ancy and a joint tenancy at common law is, the want of power in one of the
parties in the case of the homestead to sever the tenancy.

APPEAL from the District Court, Sixth Judicial District, Yolo County.

The facts are stated in the opinion of the Court.

*H. H. Hartley,* for Appellants.

At the time of the commencement of this action the first mortgage had been outlawed nearly a year and six months, the same having matured on the 17th of March, 1865, and the suit commenced on the 15th of September, 1866. Besides, on the 1st of March, 1865, the then holders of said mortgage entered a discharge and satisfaction of it in the Recorder's office, and the old note and mortgage was canceled and surrendered to the defendants.

By the effect of these acts the plaintiffs clearly manifested an intention of accepting the second mortgage as a substitute and in actual satisfaction of the former one. Thus, then, the new note and mortgage having been accepted in lieu of the first, and the latter having been permitted to outlaw before suit was brought, no recovery ought to have been permitted upon it in said action.

It is true that in equity an instrument canceled through mistake, accident, or fraud, can be revived, or the cancellation set aside, and a recovery then permitted on it; but this cannot be done in any case after the Statute of Limitations has intervened, except, perhaps, where the fraud has only been discovered within a short period. In this case no such course is adopted.

When the first note and mortgage were given, the wife signed. She then knew the extent of her liability—that during the period of the Statute of Limitations the property was always liable to the amount of the principal of the note and interest—but she also knew that if the holder of the note allowed it to outlaw, her husband could not enlarge her liability, or further incumber the homestead by renewing it, any more than he could by contracting a new debt. And while things were in this condition, she was asked to renew

it—which she positively declined to do—and then her husband, disregarding her wishes, renewed it of his own accord. Can it be said that she is held on this new mortgage? If that be so, then a mortgage made by a husband and wife for six months, for a small sum, may be indefinitely renewed by the husband, till it amounts to enough to consume the entire homestead.

It is true that this Court has held that a renewal of a note renews a mortgage given to secure it, without any absolute drafting of a new mortgage, and that any one buying from the mortgagor after the renewal, is bound by the mortgage, although that appears outlawed on the records; but it has also held that no such renewal can take place when a new estate or right has intervened. So, in this case, when the attempted renewal was made, the new right or estate of the wife, to wit: the homestead claim, had attached.

*Coffroth & Spaulding*, for Respondents.

Courts of equity never permit a party to take advantage of his or her own wrong. Both the defendants signed the original note and mortgage, and both were bound by them. The defendant Sophia knew of the existence of the debt and mortgage, and yet the appellants attempt to carve a special estate out of the mortgaged property, and thus defeat the claim of the mortgagee. Courts do not lend a willing ear to conspiracies thus formed to outrage justice. In New York, even an absolute stranger purchasing mortgaged property, with either actual or constructive notice of the mortgage, is bound by a previous acknowledgment of the person under whom he claims of the existence of the indebtedness within twenty years. (*Heyer* v. *Pruyn et al.*, Paige, 465.)

The execution of a note, bond, or acceptance of a bill of exchange by the vendor, is not *per se* a waiver or abandonment of his lien. The question of abandonment is one of intention; there can be no abandonment without an intention

to abandon. (*Thornton* v. *Knox*, 6 B. Mon. 74; *Henley* v. *Stebbins*, 4 B. Mon. 131; 15 Ves. 328; 1 Paige, 20.)

Even the taking of security for the payment of the purchase money is not of itself a waiver or extinguishment of the vendor's lien. (Story's Equity, Vol. II, p. 470, Sec. 1,226; see, also, *Smith* v. *Owens*, 21 Cal. 11.)

The case of *Lent* v. *Morrill*, 25 Cal. 499, is decisive of the case now under consideration.


By the Court, SAWYER, C. J.:

On the 17th of March, 1860, the defendants, Frederick Babel and his wife Sophia, executed a note of that date, payable one year after date, in favor of the plaintiff, Julia A. Barber, then Julia A. Gallup, and a mortgage upon certain lands to secure its payment. Subsequently, on the 22d of April, 1861, the said defendants duly filed and had recorded in the office of the Recorder of the proper county, a declaration of their intention to hold and claim the land so mortgaged, as a homestead under the statutes of the State. Subsequently, on the 27th of February, 1865, the defendant Frederick Babel, alone, executed another note for the amount then due, in favor of plaintiff, Julia A. Barber, who in the meantime had intermarried with the other plaintiff, and a second mortgage to secure it upon the same land. The said Julia A. Barber accepted the said second note and mortgage in place of the first, surrendering up the first note, and on the first day of March, 1865, entered a discharge and satisfaction of said mortgage. At the time of giving the said second mortgage, said Babel made false and fraudulent representations to said Julia A. Barber respecting said homestead claim, by stating to her that no such homestead claim had been made. Before taking said second note and mortgage the plaintiffs applied to the defendant, Sophia Babel, to execute a further mortgage, which she refused to do, but she did not make any representations as to whether there was, or was not,

a homestead claim on the premises. The homestead is worth less than five thousand dollars.

The note not having been paid, this action was commenced.

The complaint states the facts of the case, and asks a foreclosure of both mortgages, and a sale of the mortgaged premises. The defense relies both upon the Statute of Limitations, as to the first note and mortgage, and upon payment by second note and mortgage for coin, the first being payable in any lawful money, and discharge of the former mortgage and claim; also, upon the ground that the second mortgage on the premises is void without the signature of the wife. The judgment of the District Court was for plaintiffs, foreclosing both mortgages, and defendants appeal.

The premises became the homestead of the defendants under the Act of 1860, by filing and having recorded the proper declaration, on the 22d of April, 1861. It was, of course, subject to the mortgage then existing. This Act was again amended in 1862, before the execution of the last mortgage. But after the homestead right attached, and at the time of the execution of said last named mortgage, no mortgage or abandonment could be made which would be valid or effectual for any purpose, unless executed by the husband and wife in the same manner provided for the execution of conveyances of separate property of married women. (Stats. 1862, Sec. 1, p. 519.) The last mortgage was not executed by the wife, and was, therefore, void. The wife expressly refused to execute any more papers. It is claimed, however, that the giving of the new note by the husband in the place of the old, and for the same indebtedness, was an extension of the time of payment of the old indebtedness, and that this extension continued the old mortgage in life; and such must have been the opinion of the District Court. This raises the question, as to the power of the husband to affect the rights of the wife in the homestead in any manner by his acts alone. The land is impressed with the character of a homestead by executing, acknowledging, and recording,

in the same manner as conveyances affecting real estate are required to be acknowledged and recorded, a declaration of intention to claim the same as a homestead, stating the facts prescribed by the statute; and it is provided that "from and after the filing for record of said declaration, the husband and wife shall be deemed to hold said homestead as joint tenants." (Stats. 1860, Sec. 1, p. 311.) The fourth section of the Act of 1860 provides that "the homestead * * * shall, upon the death of either husband or wife, be set apart by the Probate Court for the benefit of the surviving husband or wife and his own legitimate children;" but this section was also amended in 1862, so as to read, "the homestead property * * * shall, upon the death of the husband or wife, rest absolutely in the survivor, and be held by the survivor as fully and amply as the same was held by them or either of them immediately preceding the death of the deceased," etc. (Stats. 1862, p. 519, Sec. 2.) There is no occasion to discuss at large the question as to whether the estate of the husband and wife is exactly the same in all respects, and with all the incidents of a joint tenancy, in the technical sense of the term, as used in the common law, or, whether the term "joint tenancy" is the best that could be chosen to express the intention of the legislators. But we do not perceive why the character of the right, as defined, does not *substantially* approach very near a joint tenancy, although not created in precisely the same way, even if not a technical joint tenancy at common law. In the homestead estate most of the unities of the joint tenancy are found, for it is created by the same instrument, and at the same time. The homestead right and the joint interests are created by the executing, acknowledging, and recording of the declaration. The new character of the estate, with its new incidents, commences at that moment, and the new rights vest in both parties at the same time. So far as the homestead right is concerned, "they have one and the same interest, accruing by one and the same conveyance, (or act,) commencing at one and the same time, and held by one and the

same undivided possession." If the husband controls the property during the coverture, it is not because he has a greater, more valuable, or different interest in the homestead from that of the wife, but because the law has made him the head of the household and devolved upon him the duty of management, not for his own interest merely, but for the joint benefit of both. And since the amendment of 1862, the right of survivorship, the grand incident of joint tenancy, is added. The main substantial difference now seems to be, the want of power in one of the parties to sever the tenancy, or convey at all, without the concurrence of the other in the mode prescribed. But however this may be, there is a joint interest in the homestead—a joint *holding,* if not a *technical* joint *tenancy.* The Legislature did not adopt the provision, that the "husband and wife shall be deemed to hold the homestead as joint tenants," without some object, and the term "joint tenants" was used as best adapted to express that object. They did not intend to use a meaningless phrase, to be attended by no consequences.

It is manifest from this, and the other provisions of the Act, that the Legislature intended that the husband and wife, to the extent of the homestead value, should hold a joint estate, or interest, in the land of some kind, which could not be reached by creditors, or in any way alienated, incumbered, or impaired by the act of either, without the consent of the other. The mode of accomplishing the object adopted is by filing a declaration of intention either by the husband and wife jointly, or by either alone, stating the prescribed facts in as solemn and formal a manner as is adopted in the conveyance of real estate. It is made a public record and notice to all, like conveyances of real estate, so that none can be misled as to the character of the estate vested and held by the occupants or owners of homesteads by virtue of filing the declaration in pursuance of the statute. Whatever doubt there may be as to the power of the wife alone to devote the separate property of the husband, or the husband

the separate property of the wife, to such an object, and by their own separate act vest the joint homestead interest without the assent of the other, we see no objection to either devoting his, or her, own separate property, or the common property to such object by an act thus formal. The law gives the husband the power to control, convey, and dispose of the common property alone, and if it is competent to confer this power upon the husband alone, we see no reason why, in a proper case, it is not competent to confer it on the wife alone. If it can be competent to convey to strangers by either alone, we see no reason why it may not be devoted to the use of the parties themselves under prescribed restrictions, and with certain joint and inseverable incidents, inalienable and indestructible without the assent of both. Although the mode of creating the joint estate, or interest in the husband and wife, is not a conveyance in form from the one in whom the title stands upon the record, to the two, and although the formal legal title may be conceded to remain where it was before, yet the effect and operation of the act of recording the declaration made in due form, is to take from the separate property of the party owning and consenting—if the consent of the owner is required—or the common property of both, the property claimed as a homestead, and to vest in the two jointly an estate, or interest in the land, which interest, to the extent of the homestead value, cannot thereafter, while both live, be severed, alienated, incumbered, divested, destroyed, or impaired without the concurrent act of both parties, equally solemn and formal with that by which the new and different estate or interest was created. The new character of the estate or interest thus vested may be thrown off, and the land returned to its original *status*, by a declaration of abandonment, duly executed, acknowledged, and recorded. The express provision, that "the husband and wife shall be deemed to hold said homestead as joint tenants," certainly means that they shall hold some estate or interest as to the homestead different from that held before; that the estate or interest in the

homestead shall be joint; and that the wife, at least, shall have a more distinct, specific, individual, available, indestructible, and valuable interest or right than she held before; otherwise the provision is without meaning and without consequence. Aside from the terms of the Act, the circumstances under which it was passed show that the object indicated was intended to be accomplished. Under the Act of 1851, in a series of decisions prior to 1859, the Courts held that there was in the homestead "a sort of joint tenancy with the right of survivorship, at least as between husband and wife," which could not be altered or destroyed except by the concurrence of both in the manner provided by law. This seems to have become the settled construction of the Act, and was in no way interfered with by the Legislative Department of the Government. It must, therefore, be supposed to have been satisfactory to the people, but at the October Term, 1859, our predecessors felt called upon to overrule the prior series of decisions and adopt different views. The very next Legislature, however, passed the Act of 1860, and thereby promptly sanctioned by express legislative action the views which at first prevailed, but provided a more ready and satisfactory mode of impressing the land with the homestead character, and making it a matter of public record, so that none could be misled as to the existence and extent of the homestead right. The use of the very specific language, under the circumstances, shows that the Legislature was determined not to be misunderstood, and that there should be vested by the Acts indicated a joint estate or interest in the land, to the extent of the homestead value, which could not be alienated, incumbered, or impaired, unless by the concurrent act of husband and wife, in the mode prescribed by the Act. If the Legislature has not succeeded in effecting the object so clearly manifest, it will be difficult for that department of the Government to adopt language which will stand the test of judicial criticism. The law, doubtless, goes beyond the express injunction of the Constitution upon the subject of protecting the homestead.

The policy, however, was adopted by the Legislature at an early day, and has been rigidly adhered to in every amendment made during the last seventeen years. The prompt interference of the Legislature and restoration, substantially, of the law as at first announced by the Courts upon the reversal of the said decisions made, shows that it had the approval of the people. The question of policy is one for the Legislature alone, as the representatives of the people. It is no part of our duty to throw obstacles in the way of the operation of the law, or to seek by construction to frustrate the policy adopted, but, on the contrary, our duty is, to carry out its provisions in good faith, according to the true intent and spirit of the law, as gathered from its provisions, when read by the light of the surrounding circumstances. And, under its provisions, we are of opinion, that there is a joint estate or interest in the homestead vested in the husband and wife, which can only be divested by the concurrent act of the husband and wife, so long as she continues a resident of the State, and that this interest can no more be affected without her concurrence in the mode prescribed, than the ordinary estates in the lands of others without the concurrence of the parties holding them.

The cases of *Lord* v. *Morris*, 18 Cal. 482, *Lent* v. *Morrill*, 25 Cal. 499, *Lent* v. *Shear*, 26 Cal. 370, *Low* v. *Allen*, 26 Cal. 141, and other cases to the same effect, establish the principle that after a conveyance of the mortgaged premises, or the transfer of any interest therein, the mortgagor has no power to create, revive, renew, or prolong a charge upon the premises or interest therein, so conveyed or transferred, while such interest remains in another party. In *Lent* v. *Shear*, Lent owned the first, (Hadder's,) and Grogan a subsequent mortgage executed by Shear. We held that "neither an acknowledgdment of the indebtedness in writing by Shear, nor the commencement of a suit to foreclose the Hadder mortgage against Shear, would have prevented the running of the Statute of Limitations on the prior mortgage as against Grogan, unless he also should be made a party." (26

Cal. 369.) We said: "Obtaining a written acknowledgment of the indebtedness from Shear, or commencing suit against him, would, therefore, have been of no avail to prevent the bar of the statute as to Grogan, without Grogan himself becoming a party to the renewal of the contract, or to the proceeding for foreclosure." (26 Cal. 370.) And the same principle is involved in *Low* v. *Allen*, (26 Cal. 141.) This is plain enough on principle. A party can only affect by his acts that which he himself owns, and can affect even that only in some mode allowed by law. He has no authority over the property or interests of others.

The principles established by these cases directly apply to the case under consideration. The original note and mortgage were valid, but subsequent to the making of this mortgage the defendants duly recorded their declaration of homestead, and thereby became jointly vested with new and important rights, which were inalienable, except in the mode prescribed by the statute. The wife acquired a new, distinct, personal interest, which she did not before have, and which she could not afterward be deprived of by any act of the husband. "No alienation, sale, conveyance, mortgage, or other lien of or upon the homestead property shall be valid or effectual for any purpose whatever, unless the same * * * be executed and acknowledged by the wife * * * in the same manner as provided by law in case of conveyance by her of her separate and real property." (Stats. 1862, p. 519, Sec. 1; *Sears* v. *Dixon*, 33 Cal. 326.) The mortgage subsequently executed by the husband was not executed by the wife, and was, therefore, if the statute means what it says, invalid and ineffectual for any purpose whatever. The giving of the new note, and extending the time of payment, were, also, the act of the husband alone, to which the wife was no party. Under the authorities cited, he could no more indirectly in this mode effect the same purpose, by continuing the old lien beyond the time when the action would be barred, as to the wife, than in the direct mode attempted of executing a new mortgage and discharging the old. If the lien

was continued, it was by virtue of a new contract affecting
this land.   To continue the old mortgage in force, after it
had been barred, and sell under a decree of the Court fore-
closing it, would be to effect an alienation through the aid
of the Court, and a new contract, as clearly and effectually
as though the same result should be accomplished by making
and foreclosing the new mortgage.   The fraudulent repre-
sentations of the husband cannot affect the question as to the
Statute of Limitations, for the wife was no party to the
fraud.   She made no representations upon the subject.   She
expressly refused to execute the new mortgage, and thereby
put the mortgagees on their guard.   They must have sup-
posed it important to obtain her signature, or they would
not have sought it.   The declaration of homestead was a
matter of public record and notice to all the world.   The
mortgagees had the means of knowledge, and as to the wife,
at least, they were bound to take notice of the homestead
estate.   The fraudulent representations were the act of the
husband alone, and he was no more authorized to prolong
the Statute of Limitations, thereby creating a new right, and
to destroy the homestead right in this way, than in any other.
He had no power, alone, to affect it in any manner.   Had
the husband conveyed the premises after the first mortgage
to a stranger, who put his deed upon the records, and then,
by similar fraudulent representations, induced the mortgagee
to take the new note and mortgage, we apprehend that no
lawyer would contend that the grantee would have been
affected by the transactions, so long as the present decisions
upon the subject are regarded as law.   The homestead
interest subsequently acquired is just as sacred as any other
recognized and protected by the law, and the interest of the
wife thus acquired can no more be affected by the acts of
the husband alone, fraudulent or otherwise, than the interest
of any other party.   If the mortgagee lost anything by trust-
ing to the false representations of the husband, when the
records afforded notice of the true state of the case, the wife
is not in fault, and the plaintiff is, unfortunately for the

credit of human nature and her own interests, not the first in the business world to find herself a "victim of misplaced confidence." The result is, that the second mortgage is void, and the first is barred by the Statute of Limitations, the husband alone having no power to continue it as against the joint homestead right subsequently vested.

The case of *Swift* v. *Kraemer*, (13 Cal. 530,) cited as determining the question now presented, contains nothing inconsistent with the views expressed in this opinion. In that case there was no question under the Statute of Limitations. The Court simply held that the substitution of the subsequent note and mortgage to the extent of the amount due on the prior mortgage was in equity an assignment of the former indebtedness, and "not creating a new incumbrance, but simply changing the form of the old." It is further said: "A Court of equity, looking at the substance of such a transaction, would not permit a release intended to be effectual only by force of and for the purpose of giving effect to the last mortgage, to be set up even if the last mortgage was inoperative. It would not permit Revalk to take Kraemer and Eisenhardt's money and apply it in extinguishment of a prior incumbrance, and then claim that the property should neither be bound by the new mortgage or the old. The last mortgagees would be in equity assignees of the debts they paid and be subrogated to the rights of their assignors; for in equity the substance of the transaction would be the assignment of the old mortgages in consideration of money advanced." (13 Cal. 530.)

No new right was acquired or conferred here, but the decision went upon the idea, that a Court of equity would continue in existence and enforce the old right not yet barred. Had the suit now under consideration been brought before the action on the old note and mortgage was barred, and no question under the Statute of Limitations had arisen, then, there would have been some analogy between the cases, for it could well have been said that the execution of the second note and mortgage, and surrender of the first, and cancella-

tion of the mortgage upon the record, had been procured by fraud, and the transaction being void on that ground, the old note and mortgage would be still alive, and unaffected by it. The satisfaction being void, there would then have been a valid, live mortgage to foreclose. But in this case, if we consider the new note and mortgage, and the discharge of the old mortgage void, on the ground of fraud, the old cause of action is itself barred, by the statute, and no action can be maintained upon the mortgage, unless a new right has been acquired as against the wife and the homestead estate; and this new right could not be created by the act of the husband alone in any form. Besides the homestead right, and provisions concerning it, under the old Act were defined with much less precision, and there was much more latitude for construction, than under the Act now in force.

The husband having been discharged in insolvency from the debt in question, there is, and can be, no personal judgment against him, and, as the action to foreclose the mortgage fails, there is nothing left.

Judgment reversed, and the Court below directed to enter judgment for defendants.

Mr. Justice RHODES dissenting.